IN RE RAFAEL BOSCH, Respondent.

No. 59. Argued May 1, 1945.—Decided July 6, 1945.

*Manuel Benítez Flores, Heriberto Torres Solá,* and *R. Cuevas Zequeira* for respondent. *L. Morales Contreras, José Bosch Roqué, Rafael Arroyo Ríos, Gaspar Rivera Cestero, B. Sánchez Castaño,* and *Félix Ochoteco, Jr.,* attorneys for the Bar Association of Puerto Rico, as *amicus curiae. R. A. Gómez, Prosecuting Attorney (Fiscal),* for The People.

Mr. Justice Snyder delivered the opinion of the court.

This is a complaint praying for the disbarment of Rafael Bosch as a member of the bar of this court for alleged misconduct. We examine first the contention of the respondent that we have no jurisdiction in this case because he is not authorized to practice law in Puerto Rico.

Bosch was born in Puerto Rico in 1898 and lived here until 1918. In 1917 and 1918 he attended the law school of the University of Puerto Rico. In 1918 he left Puerto Rico to complete his legal education in continental United States. He was admitted to the New York bar in 1923, and was thereafter admitted to practice in the District of Columbia.

In 1925 he was admitted to the United States District Court of Puerto Rico, but continued to practice for the most part in New York.

During 1934 Bosch was stationed in Puerto Rico as an attorney for the N.R.A. On February 21, 1934 he filed a sworn petition in this court for admission to our bar. He prayed for admission without examination pursuant to Act No. 78, Laws of Puerto Rico, 1928, on the basis of his previous practice in New York for more than two years and in the United States District Court for Puerto Rico for more than one year. He swore that he had practiced in the United States District Court for Puerto Rico since 1925 "at different intervals and especially in 1928", and that he *now resided in San Juan*. After all the steps required for admission had been taken, including a favorable report by the Character Committee, we granted the petition, and Bosch took his oath as a member of the bar of this court on March 15, 1934. Shortly thereafter Bosch returned to New York, where he has practiced to date. He has never actually engaged in the practice of law in the insular courts of Puerto Rico.

Bosch argues that we cannot disbar anyone who is not authorized to practice law in Puerto Rico. And he contends that he is not authorized to practice here on the theory that, although we admitted him to the bar in 1934, he has never become a member of the Bar Association of Puerto Rico. He relies principally on § 3 of Act No. 43, Laws of Puerto Rico, 1932, which reads as follows: "After the first general convention of the Bar Association, no person who is not a member thereof shall practice law in this Island."

Control of admissions to our bar is inherent in this court, legislation on that subject is only advisory, not binding, on us. *Ex parte Jiménez*, 55 P.R.R. 51; *Guerrero* v. *Court of Tax Appeals*, 60 P.R.R. 236; *People* v. *Goodman*, 8 N. E. (2d) 941 (Ill., 1937). It is true that we have enforced Act

No. 43—which in many respects follows state statutes providing for an integrated bar—to the extent that at the request of the Association we have suspended from practice members of our bar who have failed to pay their annual Association dues provided for in § 9 and have therefore been suspended as members of the Association pursuant to § 10. *Bar Ass'n of Puerto Rico* v. *Fajardo*, 51 P.R.R. 512. Likewise, we have reinstated such attorneys after payment of their delinquent dues. But no inference can be drawn from those cases that we have surrendered control over membership in our bar to the Association. Indeed, Act No. 43 on its face negatives any such contention. Section 4 provides that "All attorneys-at-law who are admitted to practice in the Supreme Court of Porto Rico and who comply with the duties hereby determined for them, shall be members of the Bar Association."

We have chosen to accept Act No. 43 as satisfactory legislation to aid this court in regulating admissions to the bar and the conduct of its members. But the decisive steps in attaining admission to our bar are our order granting a motion for admission and the taking of the oath pursuant thereto. Once these events occur, as § 4 recognizes, the payment of dues and the performance of any other duties required by Act No. 43 are mechanical steps which, if taken by one whom we have admitted to practice, entitle him automatically to membership in the Bar Association. While it is true that in order to utilize the privilege which we grant a lawyer to practice in our course he must also be enrolled in the Association, that body has no discretion to refuse him the membership therein to which his oath before this court entitles him.

Past controversies between Bosch and the Board of Governors of the Association relating to his admission to the Association have no bearing on this case. If he had chosen to submit those controversies to us, we would have directed

the Board of Governors to enroll him in the Association, provided he complied with Act No. 43. And we would have settled forthwith the dispute as to whether Bosch was required to pay certain back dues prior to admission to the Association, as the Board of Governors was contending.

We are therefore unable to agree with Bosch that under the circumstances herein we have no jurisdiction to discipline him for misconduct. It may be conceded that he could not practice law in Puerto Rico until he was enrolled in the Bar Association. But that was a purely formal and routine step which he could take at any time; his privilege to practice stems from his oath before us, not from his membership in the Association. Once he takes his oath as an officer of this court, he may thereafter be called to account to this court for his professional conduct in order that we may determine if our order admitting him to practice shall be withdrawn. Indeed, to hold otherwise would be to permit any local attorney who was threatened with such a proceeding simply to neglect payment of his dues as a member of the Association. The latter would suspend him, whereupon he could deny our jurisdiction to discipline him on the ground that he was not a member of the Association.

It is true that this case is unique in several respects. Since Bosch never became a member of the Association, he never actually engaged in the practice of law in the insular courts of Puerto Rico. And the misconduct imputed to him took place, as we shall see, in the District of Columbia and New York. We readily agree that it would have therefore been more desirable for the charges herein to have been heard in the jurisdictions where they took place. But why that has not been done is not our concern. The case having been brought to our attention, we cannot shirk our duty because this proceeding might have been brought more appropriately elsewhere. Here we are concerned only with our jurisdiction. And Bosch concedes, and the cases hold, that

an attorney who practices law in one jurisdiction may be disciplined for improper conduct which took place outside that jurisdiction. See *In re Porep*, 111 P. (2d) 533 (Nev., 1941); *Geibel* v. *State Bar of California*, 79 P. (2d) 1073 (Calif.. 1938); *Richmond Ass'n of Credit Men* v. *Bar Ass'n*, 189 S. E. 153 (Va., 1937); *Barnes* v. *District Court*, 173 Pac. 1100 (Calif., 1918); *In re Craig*, 82 P. (2d) 442 (Calif., 1938).[1]

The facts that Bosch was a member of the New York bar prior to his admission to our bar, that he has never practiced here except in the United States District Court, and that he left Puerto Rico after admission to our bar to resume the practice of law in New York in which he has been engaged to date, do not operate to deprive us of jurisdiction in the premises. Membership in the bar of more than one state is not unknown in this and other jurisdictions. And so long as any member of our bar remains an officer of this court, it is our duty to examine his conduct, irrespective of where it took place, when it is called into question in a proper proceeding before us.

 Another challenge to our jurisdiction does not require extended consideration. On June 16, 1944 the President of the United States submitted to the United States Senate the nomination of Bosch to fill a vacancy in the post of Associate Justice of this court. While the nomination was pending in the Senate, the complaint herein was filed by the *Fiscal* of this court on November 6, 1944. Bosch asserts that for us to entertain the complaint under those circumstances constitutes a violation of the constitutional doctrine of the separation of powers. His thesis is that by so doing we are impairing the constitutional function of the Senate to confirm presidential nominations.

---

[1] Bosch contends that those cases nevertheless do not apply because he has never actually practiced here. We think they apply equally to one who is authorized to practice in this jurisdiction, albeit he has never chosen to avail himself of this privilege.

238

We cannot agree. In the first place, the nomination of Bosch is no longer before the Senate in view of its failure to take any action thereon prior to the adjournment *sine die* late in 1944 of the Seventy-Eighth Congress and in view of the failure of the President since that date to make a new nomination of Bosch or anyone else. In addition, with all due respect, we conceive it our duty under the Organic Act [2] to yield to no one, including the United States Senate, the function of determining whether a member of our bar has engaged in improper professional conduct warranting disciplinary measures by this court. Indeed, the same constitutional doctrine of separation of powers invoked by Bosch is the foundation for our view that this disbarment proceeding cannot be affected by any matter that might be pending in the Senate. Nor, we need hardly add, can any action we take affect the Senate in the performance of its constitutional prerogatives.[3]

■ This complaint charges misconduct by Bosch, as an attorney and notary public of New York, in connection with Mexican divorces obtained by Bosch for one Modesto Soler and others. These charges will be better understood if a preliminary statement of facts is made.

Soler was born in Puerto Rico. Like hundreds of thousands of other Puerto Ricans, he moved to New York City, where he has been domiciled since 1938. In 1943 he was in the armed forces as a private, stationed at a camp in Tennessee, where Etienne Fraticelli, another Puerto Rican and fellow-soldier who likewise migrated to New York a number

---

[2] See *Banco Popular v. District Court*, 63 P.R.R. 63.

[3] What we have said—and what we propose to say in the remainder of this opinion—cannot and should not be construed as intended to influence the President or the Senate in filling the vacancy on this court. It is not pleasant to be compelled to pass on the conduct of an attorney whom the late President Roosevelt nominated for that vacancy. But is discharging that painful duty, we emphasize that we are passing on the complaint before us, and nothing more. Any other conduct by us would be both presumptuous and improper.

of years ago, was also stationed. Fraticelli and Bosch were raised in the same small town in Puerto Rico, and had been friends for many years.

During 1943 Bosch, as a practicing attorney of New York, was handling a divorce case for Fraticelli. On September 27, 1943 Fraticelli wrote Bosch that Soler also wanted Bosch to get him a divorce because his wife in Puerto Rico had given birth to two children by other men. Bosch wrote Soler on September 29 that he had sufficient grounds for divorce, which Bosch could obtain if Soler would answer certain questions as to his witnesses, his residence, the exact address of his wife, and whether he was thinking of marrying again. On October 2 Soler answered that he came to New York City in 1938; that he has lived there since that date; that he now lives at a certain New York address with his uncle and aunt; that his wife's exact address was Playa Naguabo, Puerto Rico; and that he did intend to marry a girl in New York.

Bosch replied on October 5 that he could be divorced in New York, following the same procedure used for Fraticelli, at a cost of $250. He stated he would file the complaint immediately upon receipt of the first instalment of his fee. On October 7 Soler answered this letter, giving Bosch certain additional information. He went on to state "As I understand it, you are going to file the complaint or rather you are going to publish it in the paper, as that is how I want it to be, since I do not want her to know anything about this." He also inquired if "I can marry while I am being divorced or do I have to wait until I am completely divorced. I am asking you because I do not know much about the laws here." And he explained that he had no money, but would send $100 as soon as he received it from his parents in Puerto Rico.

Without waiting for a reply to this letter, Fraticelli, apparently at the instance of Soler, wrote Bosch on October 11 indicating that Bosch's fee could be paid more easily

after Soler married again. This letter contained the statement "his idea is to marry now when he goes on furlough". Bosch replied to Fraticelli, acknowledging his letter of October 11 and the letter of October 7 of Soler. This letter, dated October 13, read in part as follows:

"Your friend wrote me he wanted to marry as soon as possible. He asked me if he could marry while the divorce trial was pending. My answer is the following: He cannot marry while the divorce is pending, and what is more, the law prohibits him from marrying until three months have elapsed from the date of the judgment of divorce.

"In view of this situation. if he is in a great hurry to marry then what he ought to do is to be divorced in Mexico, where the divorce will take from six weeks to two months, and above all he would not have to wait any longer, as he could marry as soon as he had the judgment. The cost would be the same, but it is much easier since the only thing he would have to do would be to sign a document that I would send him and the defendant does not have to be summoned. The summons is made there by edicts which are published in the newspaper in the place in Mexico where the divorce is requested.

"If he wants to do this let him notify me and I will prepare the documents so that he may sign them at once and we can wait until he receives the hundred dollars from Puerto Rico but he would have to advance the sum of $25 for me to begin. Upon receipt thereof I shall prepare the documents and send them at once." This letter has a postcript which reads: "In the event that he wants to proceed without any loss of time I am sending the document that he must sign and return to me at this address."

The said enclosure was a power of attorney authorizing one Moisés Garza Ramos, an attorney residing in the city of Juárez, State of Chihuahua, Republic of Mexico, to appear in a competent court of that State to file and prosecute a suit for divorce by Soler against his wife on the grounds

of separation for more than one year and incompatibility of character. This power of attorney authorized Garza to submit Soler to the jurisdiction of the said Mexican Court for the purpose of obtaining the said divorce. The power of attorney recited that the only child of the marriage is in Puerto Rico, but gave no address either for the wife or for the child. It also purported to be executed and sworn to before Bosch, as a notary public of Queens County, on October 13, 1943 in the City and County of New York, New York.

When Soler received the power of attorney from Fraticelli, he executed it at the camp in Tennessee on a date subsequent to October 13, and returned it to Bosch. On October 19 Soler wrote Bosch in reply to the letter of Bosch of October 13 to Fraticelli. In this letter he said: "I received your letter yesterday, Monday, which I am answering at once to tell you that I agree that you should get the divorce as you say, that is, in Mexico. According to what you say there it can be done in six weeks, or two months. I am sending you forty-five dollars ($45) now in order that you do what you can. Then I will send you the rest of the hundred dollars, and I will try to pay you all the money as soon as possible."

After receiving the power of attorney by mail, Bosch signed it in Washington as a New York notary and by letter of October 21 forwarded it to Garza stating that he would send the marriage certificate and the birth certificate of the child as soon as they were received from Puerto Rico. Although Bosch knew from the letter of October 2 of Soler to him that the wife resided at Playa Naguabo, Puerto Rico, the letter to his correspondent is silent as to her whereabout. It likewise contains no instructions or any comments on the method of service of the defendant wife.

It is conceded by Bosch that the laws of Mexico required that the said power of attorney must be executed and sworn

to before a notary. He also concedes that the divorce law of Chihuahua authorizes summons of the defendant by publication only in the event the domicile of the defendant is not known, with the penalty of nullity if during the trial it is established that, when the action was commenced, the plaintiff knew the domicile of the defendant; and he admits in his answer that he knew this to be the law of Chihuahua during the period of time involved herein.

Fraticelli wrote Bosch on October 26 inquiring if Bosch had received Soler's money and if he was going to proceed under the laws of Mexico or of New York. Bosch then wrote Soler on October 28 that he had received Fraticelli's letter and the $45, and that "As you ought to know I have already presented the matter in Mexico, since immediately after I received the power of attorney which you signed I forwarded it to my colleague in Mexico. . ." Soler acknowledged this letter on November 3, sending $25 more and asking for further developments.

On February 18, 1944 Bosch wrote Soler that the judgment of divorce had been entered, and that he had received two copies thereof from his correspondent which he would send to Soler upon receipt of the balance of his fee. The record in the divorce proceeding shows that Garza, alleging that the domicile of the wife was unknown, served the wife by publication in Chihuahua, and obtained a judgment by default without the presentation of testimony by either party, neither of whom was ever present or ever resided in Mexico.

Soler did not reply immediately to Bosch because Soler had taken his problem to the Legal Assistance Officer at the camp, who proceeded to correspond with Bosch. Soler finally wrote Bosch on March 25, indicating that he considered the matter closed as the Legal Officer had advised him the Mexican divorce was not valid. This terminated the correspondence between Soler and Bosch. Soler never sent Bosch the remainer of his fee, and Bosch never forwarded the Mexican judgment of divorce to Soler.

*Charges 1 and 2*—We turn to the first two charges, which we shall consider together. As we have seen, Bosch attested as a notary that Soler had on October 13, 1943 in the County and City of New York in his presence executed and sworn to the power of attorney authorizing Garza to obtain a Mexican divorce for him. The charge is that Bosch had never met Soler at that time, and did not know his signature; that the power of attorney was actually prepared by Bosch and sent to Soler in Tennessee by mail, with instructions to sign it and to return it; that it was executed in Tennessee by Soler outside the presence of Bosch on a date subsequent to October 13; and that Bosch attested that the power of attorney was executed before him as a notary in New York on October 13 knowing that this was false.

In his answer Bosch admits the facts as to these charges, except that he alleges that he knew the signature of Soler through correspondence with him, and that the power of attorney was actually signed by Soler and was subsequently used for the purpose for which it was executed. He further alleges that he had no criminal intent to defraud, and that he violated no law of New York or of any other jurisdiction.

The New York courts have in the past been confronted with similar situations. In the case of *Matter of Barnard,* 151 App. Div. 580 (1912), an attorney who was a notary certified that documents were acknowledged before him in New York as a notary which were actually mailed by him to the affiant in Washington, signed in Washington, and returned by mail to the attorney, who then affixed his signature thereto. In disposing of a disciplinary proceeding brought against this attorney for the said misconduct, the court calls his offense "a most serious one". It states that (p. 583) "It is difficult to understand how an attorney at law of the standing. position and education of the respondent should have been guilty of such and offense, and he cannot be too severely censured for his conduct." However, in view of the fact that the respondent had frankly conceded his offense, that it was

committed without attempt or intent to defraud anyone, and that the signatures acknowledged were actually genuine, it confined the punishment to censure, but warned (p. 583) "that if, after this expression of our views, such an offense should be committed, we should consider it our duty to act with greater severity."[4]

In the case of *Matter of Napolis,* 169 App. Div. 469 (1915), an attorney who was also a notary called the affiant on the telephone, recognized his voice, swore him to the affidavit over the telephone, and then affixed his name and official title to the jurat. The court said at p. 471: "This affidavit does not appear to have been intended to have been used in any judicial or legal proceeding and, so far as appears, was not so used. Of course, such a method of administering an oath is entirely illegal and unauthorized, and respondent in acting as he did was guilty of a misdemeanor, but he has also submitted a full and frank answer to this charge, has admitted the offense and has not sought to exonerate himself by false statements to the court or by a denial of any of the facts stated. The offense is a serious one and receives the severe condemnation of the court. It is inconceivable that a member of the profession should so far forget his duty to the profession and to the public as to violate his duty and commit an offense against the criminal law." The court here likewise imposed the punishment of censure.[5]

---

[4] In *People* v. *Reiter,* 273 N.Y. 348 (1937), the Court of Appeals of New York, citing *Matter of Barnard,* held that such conduct constitutes a misdemeanor under subdivision 2 of § 1820-*a* of the Penal Law of New York which reads as follows: A notary public or commissioner of deeds, who in the exercise of the powers, or in the performance of the duties of such office shall practice any fraud or deceit, the punishment for which is not otherwise provided for by this act, shall be guilty of a misdemeanor."

[5] Other New York cases cited by the Bar Association which appears here as *amicus curiae,* in which the severer punishment of disbarment was imposed, involved fraud, perjury or other misconduct in addition to the making of a false acknowledgment. *Matter of Gottheim,* 153 App. Div. 779 (1912); *Matter of Sprung,* 229 App. Div. 501 (1930); *Matter of the Application of the Brooklyn Bar Association,* 225 App. Div. 680 (1928).

In view of these cases, it is obvious that we must at least severely censure Bosch.[6] And we might be disposed to adopt that measure of punishment for the first two charges if, as in those cases, Bosch had freely conceded his misconduct. But that is not what has occurred here.

The defense of Bosch is that after he received Fraticelli's letter of October 11 that Soler was coming to New York on furlough, on October 12 Bosch went from the District of Columbia, where he was spending most of his time, to his New York office to take care of this and other matters; that he prepared the power of attorney, dated October 13, and waited in his office during the thirteenth for Soler to appear in order to sign and verify the power of attorney; and that when Soler failed to appear, Bosch enclosed the power of attorney in his letter of October 13 to Fraticelli, as the postscript thereto indicated, for Soler to execute and return to him.

Bosch asserts that because of pressure of work due to the fact that he was spending only one day in New York, he "forgot" that Fraticelli had not been able to find a notary at the camp when Bosch had sent him a complaint to verify in his own New York divorce suit, and he also "forgot" to advise Soler to have the power of attorney notarized before an Army officer. In the same way, he "forgot", he asserts, to advise Soler that if a notary was not available, an unsworn complaint signed by Soler could be filed in Mexico.

Bosch points out—and the testimony shows this to be a fact—that when Soler received the power of attorney, Soler signed and returned it on the advice of Fraticelli, despite the fact that it professed to be verified before Bosch, because Fraticelli had previously been advised by Bosch, after Fra-

---

[6] Bosch argues that he committed no crime in New York as the false acknowledgment was made in the District of Columbia. This is a frivolous contention. This is a disbarment proceeding, not a criminal proceeding. See *In re Tormes*, 30 P.R.R. 248. And if anything, the offense, for our purposes, is aggravated by the conduct of Bosch in purporting to act as a New York notary in the District of Columbia.

ticelli had reported to Bosch that no notary was available at the camp, that he could sign without verification his divorce complaint which was to be filed in New York.[7]

Bosch had enclosed a self-addressed envelope to be used by Soler to forward the executed power of attorney to him in New York. Soler sent it to New York, and it was forwarded to Bosch in Washington. Bosch asserts that when he received it in Washington, he was working day and night in his capacity as counsel to a Sub-Committee of the Senate Committee on Territories and Insular Affairs and that "although I do not remember exactly what occurred, I can testify that I must have signed the power of attorney and forwarded it to my correspondent in Juárez, Chihuahua, in one of those moments in which my mind was completely exhausted. . ."[8]

We are unable to give credence to several important parts of this story of Bosch, which we regard as an afterthought. In the first place, we cannot believe that Bosch understood the casual reference in the letter of October 11 from Fraticelli to Bosch—"his idea is to marry now when he goes on furlough"—to mean that Soler was already on a train from Tennessee to New York and would meet Bosch in the New York office of Bosch on October 13 to sign a power of attorney. No date of departure or arrival was mentioned in the letter, and nothing was said about coming to New York in order to see Bosch; moreover, Fraticelli clearly indicated that Soler was to get a furlough in order to marry in New York, and not simply to swear to a power of attorney for a divorce which would then take two more months to obtain.

---

[7] Bosch wrote Fraticelli on October 5, 1943 simply to sign the New York divorce complaint as verification was not indispensable. The objection of the *Fiscal* to the admission in evidence of this letter is hereby overruled.

[8] The quotation is from the affidavit of Bosch filed herein. We took no testimony in open court, as the parties entered into a stipulation submitting the case on exhibits and affidavits. The exhibits include a transcript of the testimony adduced at hearings by the Judiciary Committee of the Senate on the nomination of Bosch as Associate Justice of this Court.

As Bosch points out, a signed but unverified complaint, or notarization of the power of attorney by an Army officer, were other obvious solutions. Why Bosch did not choose them is not for us to say.[9] The fact is that he preferred to use a power of attorney, which required verification under Mexican law, as Bosch knew. Yet he asks us to believe that he expected Soler to use his furlough, which he hoped to get whenever he could remarry, to come to New York from a camp in Tennessee simply to swear to the power of attorney. In the light of these circumstances, we cannot accept the statement of Bosch that he went to New York believing that Soler would meet him at his office there on October 13, and that he therefore prepared the power of attorney in anticipation of the arrival of Soler to verify it.

The fact is that on that same date, October 13, Bosch, as we have seen, wrote Fraticelli—with a heading indicating it was being written in the Senate Office Building in Washington, and not in New York—enclosing the power of attorney for Soler to sign. Bosch does not say a word in that letter about the alleged failure of Soler to appear in his New York office or indicate in any way that he had been expecting him. Nor does he explain to these untutored laymen how a power of attorney purporting to be verified before him as a notary in New York can be validly executed in Tennessee outside his presence by the affiant. Their ignorance in failing to differentiate between the unverified complaint in the New York Fraticelli case and the power of attorney in the Mexican Soler case may explain the action of Soler in signing the latter. But surely that does not justify the misconduct of Bosch as a notary.

---

[9] We cannot understand how Bosch can assert that due to pressure of work he ''forgot'' to advise Soler that he could swear to the enclosed power of attorney before an Army officer if a notary was not available, when the power of attorney, prepared by Bosch, provides in the text that it is being executed and sworn to before Bosch in New York.

Likewise, the plea that Bosch signed the power of attorney under pressure of work and therefore did not know what he was doing does not impress us. This is not the case of one who in a moment of abstraction signs a paper along with many others put before him. The power of attorney was prepared by Bosch himself for execution and verification by one of his clients. Bosch had handled a number of such cases; he knew that under Mexican law it must be verified. He also knew, both from his practice and his writings, that in civil law jurisdictions like Mexico not only is a high degree of solemnity attached to such verifications, but the notary, far from performing merely the routine function of swearing the parties, has the duties of drafting the instrument, certifying to its validity, and explaining its contents to the affiants. Indeed, Bosch very properly fulfilled these civil law requirements by reciting in the last paragraph of the power of attorney that "I read this instrument to the affiant, and warned of his right to read it which he waived, and warned of its legal force and effect by the explanation which I gave him of it, he ratified its contents and signed together with me at the same moment, as the notary; as to all of which I, the notary, attest."

Bosch wrote the letter of October 13 directing that the power of attorney be merely *signed* by Soler in Tennessee. Soler signed it and mailed it to Bosch. Bosch completed the document while in Washington by signing it there as a New York notary and adding in his own handwriting "Queens County, New York, Commission Expires Mar. 30, 1944." He then forwarded the power of attorney on October 21 with a covering letter to his Mexican correspondent. We thus see that at every stage of these events, which culminated in the filing of the power of attorney in a Mexican court, Bosch must have had brought forcibly to his attention that he was engaged in making a false acknowledgment of a power of attorney which was to be used on behalf of his client in a judi-

cial proceeding. Yet he would have us believe that between October 13 and 21, while he was performing all these acts requiring the exercise of judgment and legal skill in draftsmanship, he was so overworked in the performance of his duties in his Senate post that he was not aware of what he was doing—that all this happened in effect in a moment of temporary aberration.

We regret that we find the explanation of Bosch unconvincing. On the contrary, we are satisfied from the evidence that, despite the fact that Bosch could have followed the simple and legal procedure of preparing either a complaint which required signature but not verification, or a power of attorney with a provision for the oath to be taken by an Army officer,[10] he deliberately preferred to avoid taking either of those steps by making a false acknowledgment in violation of law. Like others in similar cases, he apparently thought the taking of an acknowledgment was a trivial formality which could be done by mail without any serious risk of detection.

The facts herein are not so favorable to Bosch as those found in the *Napolis* and *Barnard* cases. In those cases, although the notaries improperly acknowledged signatures made outside their presence, they personally knew the affiants and their signatures. But when Bosch certified the acknowledgment herein, he had never met Soler. His only previous contacts with him were two letters purporting to be from Soler. That the signature on the power of attorney subsequently proved to be genuine can be laid to good fortune, and not to any precautions taken by Bosch. Indeed, in an effort to bolster his story that he did not know what he was doing when he notarized the power of attorney, Bosch testified before the Judiciary Committee of the Senate that

---

[10] Perhaps this would have been a little more difficult, as notaries in continental United States are not accustomed to fulfilling the elaborate requirements of civil law countries for the execution of public documents.

he did not even compare the signature on the power of attorney with those on the letters.

Moreover, as we have seen, this was not a routine acknowledgment taken by a notary under the practice familiar in continental United States where notaries are usually laymen. This was a document prepared by Bosch on behalf of a client in the style required for use in a civil law country where the notary's functions, as Bosch well knew, have a high legal significance apart from the ministerial act involved in taking an oath. Cf. *In re Rivera*, 64 P.R.R. 605, decided March 6, 1945. And in the *Napolis* case the court emphasized as an extenuating circumstance that, unlike the instant case, the false affidavit involved therein was not executed to be used in a judicial proceeding and was not so used.

Nevertheless, despite these aggravating circumstances, in view of the fact that Soler's signature of the power of attorney was actually genuine, and that perhaps no harm was done by the false acknowledgment,[11] we would be constrained to follow the lead of the New York courts and to confine our punishment on the charges relating to the false acknowledgment to severe censure if Bosch, as in those cases, had freely conceded his error. But in attempting to justify his past conduct, Bosch has aggravated his offense by testimony under oath, some of which we are compelled to reject as unworthy of belief. With this in mind, we shall postpone final determination of the question of punishment until we have considered the other charges.

■ *Charge 3*—This charge is that although Bosch knew that the divorce law of Chihuahua authorizes summons of the defendant by publication only in the event the domicil of the defendant is not known, with the penalty of nullity

---

[11] Cf. *In re Arjona Siaca et al.*, 40 P.R.R. 102. We are not prepared to say, despite the argument of the *Fiscal* to that effect, that the Mexican divorce proceeding was wholly void *as a matter of Mexican law* because the power of attorney was not properly verified. We put this intricate question of foreign law aside as unnecessary for decision in this proceeding.

if during the trial it is established that, when the action was commenced, the plaintiff knew the domicil of the defendant, Bosch as attorney for Soler instructed Garza, his correspondent, to file in the appropriate court in Juárez, Chihuahua, a suit for divorce by Soler against his wife, and to serve the latter by publication, which instructions were carried out by Garza; and that Bosch took this action despite the facts (1) that he had been advised by Soler that the domicil of the defendant was Naguabo, Puerto Rico, and (2) that he knew that in order to summon the defendant by publication his correspondent would be required to allege, as he did allege, that the domicil of the defendant was not known. The charge concludes by alleging that by the aforesaid conduct Bosch deceived the said court and obtained thereby a default judgment of divorce.

Bosch's principal defense here is that he relied on Garza to determine the manner of service, and that Garza chose to serve the wife of Soler by publication without any instructions to that effect from Bosch. It may be true that ordinarily a New York attorney forwarding a case to a Mexican attorney would be entitled to rely on the judgment of his correspondent as to local procedural requirements such as the proper method of service. But that general statement does not present the complete picture here.

A large part of Bosch's practice in New York consisted of advising on the civil law of Latin-American countries. As a natural consequence of his experience in that field, he was retained over a period of years by a number of New York residents to obtain Mexican divorces for them. Garza, who was the Juárez correspondent for Bosch for a number of years for this purpose, filed 12 such cases for clients of Bosch in a Juárez court during the past year, including the Soler case and other divorce cases involved herein. Because of this background of familiarity with the civil law of the various Latin-American countries and particularly his ex-

perience in obtaining Mexican divorces, Bosch was well aware, as he himself concedes in his answer, that the Chihuahua divorce law authorizes summons of the defendant by publication only if the domicil of the defendant is not known.

Despite his knowledge of this provision of Mexican law and despite the fact that on October 2, in reply to Bosch's requests for information on the subject, Soler had written Bosch that his wife resided at a certain place in the small town of Naguabo, Puerto Rico, we find Bosch, before he had even sent this case to his Mexican correspondent, writing Fraticelli on October 13, for communication to Soler, that to obtain a Mexican divorce for Soler "The cost would be the same, but it is much easier since the only thing he would have to do would be to sign a document that I would send him and the defendant does not have to be summoned. The summons is made there by edicts which are published in the newspaper in the place in Mexico where the divorce is requested." And this assurance of service by publication acquires added significance when it is recalled that Soler on October 7 had written Bosch that he wanted his wife served by publication "since I do not want her to know anything about this". The promise in Bosch's letter of October 13 that service would be by publication in Mexico scarcely sounds as though Bosch proposed to leave the decision as to manner of service to his correspondent.

As in the case of the false acknowledgment, here again we find Bosch exhibiting a lack of candor. He tells us in effect that the letter of October 13 does not mean what it says. His argument is that the reference to service by publication in his correspondence with Soler had nothing to do with a Mexican divorce, but were merely to reassure Soler that his case was like Fraticelli's in that as a domiciliary of New York he could also obtain a divorce in New York with service by publication on his wife who was in Puerto Rico. This is an explanation which Bosch has contrived from the

fact that when Soler first communicated with him, Soler had apparently seen a letter by Bosch to Fraticelli suggesting a divorce for Fraticelli under that formula, and expressed a desire to use it in his own case.[12] But when Soler later wrote Bosch that he wanted to marry immediately, Bosch took the initiative and suggested instead a Mexican divorce in the letter of October 13. And in that same letter Bosch describes in unequivocal language the advantages of a Mexican divorce, including service by publication in Mexico—a method of service in which Soler had evinced interest. We should be credulous indeed if, in the face of this correspondence, we believed that Bosch had not already made a commitment to Soler that service on his wife would be by publication in Mexico.

Bosch presents no correspondence or any other evidence that he left the decision as to the manner of service in the Soler or any other case to his correspondent. He asks us so to find on his *ipse dixit*.[13] But the manner in which the Soler case was handled and the fact that in practically all the other cases forwarded to Garza by Bosch service was, as in the Soler case, also effected by publication, make it seem more likely that Bosch had some sort of arrangement with Garza whereby service by publication would be had in cases

---

[12] The original plan to serve Fraticelli's wife by publication in New York was subsequently abandoned and she was served personally in Puerto Rico with the New York complaint. But even if service had been effected by publication in New York, the law of that State would have required the mailing of a copy of the complaint to the wife in Puerto Rico. And Soler wanted service by publication without ever letting his wife know about it.

[13] Bosch introduced in evidence opinions of Juárez attorneys that his conduct was neither criminal nor improper under the laws of Chihuahua. Yet these same opinions indicate, despite his statement here to the contrary, that in soliciting these opinions Bosch advised those attorneys that in some instances Bosch instructed Garza to make service by publication.

Bosch also contends that the provision in the Soler power of attorney that Garza shall take ". . . all the steps required to obtain the judgment. . ." is evidence of his policy to leave decision of the manner of service to Garza. We are unable to agree that this general provision had any such effect, particularly in the light of all the other circumstances herein.

where Bosch desired that procedure. Certainly, in the Soler case, when Bosch forwarded the matter to Garza, he proceeded to serve by publication without further ado.

However, even if we test the conduct of Bosch in the Soler case by assuming, as Bosch asserts, that he invariably left the decision as to manner of service to his correspondent, we are compelled to reach the conclusion that Bosch was derelict in his duty to his client. For Garza to exercise his judgment intelligently and effectively on this question, it was imperative that Bosch forward to him all the information in his possession as to the whereabouts of the defendant. Yet we find Bosch, whether through design or carelessness is immaterial for present purposes, failing to advise Garza that the defendant was domiciled in Naguabo, Puerto Rico. On the contrary, he simply sent Garza the power of attorney,[14] the marriage certificate of Soler and the defendant, and the birth certificate of their child, none of which disclosed the present domicil of the defendant wife. And his letter is silent on the manner of service, although he well knew that under Mexican law the manner of service depended on the plaintiff's knowledge of the defendant's whereabouts.

The matter therefore comes down to this: Bosch contends that he cannot be blamed for the defective service because he left such matters to his local correspondent. But

---

[14] Bosch contends that the power of attorney furnished to Garza, at least indirectly, information as to the wife's whereabouts, since in it Soler ''declares that he married Mrs. Margarita Robles, who was born in Puerto Rico, November fourth nineteen hundred and thirty-eight and also declares that of the said marriage there was born on July 17, nineteen hundred and thirty-nine, an only son, named Gualberto, in the village of Naguabo, P. R. He also declares that they have no property that belongs to the community partnership, and that the said son is in the island of Puerto Rico.'' We are unable to agree that reciting in the power of attorney that Soler married a Puerto Rican lady, that their only son was born four years before in Naguabo, and that the child is now somewhere in Puerto Rico, fulfilled the duty of Bosch to furnish his Mexican correspondent with the present exact address in Puerto Rico of the wife which was in Bosch's possession.

in failing to forward information in his possession as to the defendant's present domicil, Bosch was either tacitly making the decision himself for service by publication of which he had already assured his client, or was depriving his correspondent of information essential for decision by the latter. Under either theory his conduct was culpable.[15]

Whether Garza acted properly as a Mexican attorney in not making specific inquiry of Bosch as to the whereabouts of the defendant before alleging that her domicil was not known is none of our concern. Nor do we find it appropriate to determine in this case whether, as the *Fiscal* contends, the judgment of divorce is null as a matter of Mexican law because the plaintiff and Bosch knew the domicil of the defendant when Garza, in order to obtain an order of court authorizing service by publication, alleged on behalf of the plaintiff that the defendant's domicil was not known; or whether. as Bosch argues, under the Mexican *Ley de Amparo* the defendant was at the most entitled to move in a Mexican court to set aside the judgment of divorce within fifteen days after she learned thereof and that since she has taken no such action, Soler now possessess a divorce valid at least under Mexican law, irrespective of any alleged defect in the original service on the defendant.

To dispose of the charge before us, we need only state our view that by withholding the information in his possession as to the defendant's whereabouts, Bosch certainly jeopardized the validity of the divorce he was obtaining for Soler, even as a matter of Mexican law. As he himself points out, the wife could have nullified it by an appropriate proceeding in Mexico if she had chosen to take that action. We can scarcely permit Bosch to take refuge in the fortuitous

---

[15] A Senator stated the exact issue now before us during the hearing before the Judiciary Committee when he remarked: ". . . we are still trying this man as to whether or not he has failed, as a good lawyer shouldn't fail, to do that which is emperatively necessary in cases of this kind—inform his counsel in Mexico as to the residence of the defendant so that sufficient service can be gotten."

circumstance that the wife, after she heard of the Mexican divorce through other sources, chose to ignore the entire Mexican proceeding and proceeded thereafter to obtain a divorce from Soler in Puerto Rico which Bosch apparently concedes is valid.

Whether or not Bosch practised a fraud on the Mexican court is not for us to say. Bosch has presented in evidence opinions of Juárez attorneys who exculpate him on that score. But this jurisdictional question arose in a divorce proceeding, not in a suit on a promissory note. Perhaps nothing has a more profound effect on a man living in a civilized society than his marital status. And the state, by virtue of the family relationships which flow from marriage, has an equally great interest in the marital status of its domiciliaries. We postpone temporarily consideration of whether a Mexican court could ever obtain jurisdiction of the subject matter involved in a divorce proceeding between two non-residents. Even assuming it could, jurisdiction had to be obtained over the persons involved. And such jurisdiction could be attacked, even in Mexico, if the plaintiff obtained an order authorizing service by publication by falsely alleging ignorance of the defendant's whereabouts. We therefore see no purpose in venturing an answer to the esoteric problem of whether Bosch's conduct would be considered unethical by a Mexican court against the background of the facts herein, it is enough for us to state our view that in suppresssing the information in his possession as to the residence of the defendant in the Soler case, Bosch's professional conduct was manifestly improper.

■■ *Charge 4.*—Here the *Fiscal* charges that knowing the impropiety thereof, Bosch acquiesced in the desire of his client, Modesto Soler, to prosecute his suit for divorce without advising his wife thereof, with the deliberate purpose of depriving her of the opportunity to defend herself. The charge is that this was accomplished by serving the wife by publication, since Bosch knew that if service was not made

by publication, under the divorce law of Chihuahua service would have to be made pursuant to the laws of Puerto Rico.

It is obvious from our discussion of the third charge that Bosch is guilty of this charge. Instead of rejecting forthwith the request of his client, Bosch fell in with the scheme and concealed the whereabouts of the defendant in order that the improper desire of Soler to obtain a divorce without advising his wife thereof could be accomplished.

Bosch knew that if he advised his correspondent that Soler's wife was domiciled at Playa Naguabo, Puerto Rico, the correspondent would have been required under Mexican law to serve her pursuant to the laws of Puerto Rico. To avoid this contingency, Bosch sent his correspondent no information as to the wife's domicil. This inevitably resulted in service by publication, and the granting of a divorce of which the wife had no knowledge.

It is difficult to conceive of a grosser violation of the elements of due process and fair play than this sordid episode. Perhaps Soler did not realize the consequences of his conduct. Bosch can claim no such defense.

*Charge 5*—This charge may be summarized as follows: Bosch received $115 from Soler to prosecute a valid divorce proceeding against his wife. But no such valid divorce proceeding was ever prosecuted because the aforesaid Mexican court, which Bosch himself selected, never had jurisdiction of the defendant for two reasons: (1) the defendant was summoned by publication, notwithstanding the fact that Bosch and the plaintiff knew her domicil; (2) none of the parties had a residence or domicil in Mexico. Despite these facts, and despite the fact that Bosch himself has acknowledged that the said divorce is not valid, Bosch has not returned the said sum of money to Soler.

The defense of Bosch to this charge is that since Soler was anxious to remarry at once, Bosch suggested that he could obtain a divorce for Soler in Mexico, and that Soler,

through conversations with Fraticelli and reading Bosch's letters to Fraticelli, had received the advice from Bosch which the latter always gives in such cases, which was as follows: the Mexican divorce would be void and would not be recognized in the courts of New York; it could not be used to affect the rights of his first wife and child, or in inheritance matters; and the divorce would serve no purpose whatsoever except that it would entitle Soler to remarry in Chihuahua, which could be performed by proxy, without any danger of prosecution for bigamy.

We put to one side the contention of the *Fiscal* that Bosch collected $115 from Soler which he has not returned. Indeed, Bosch now asserts without contradiction that he recently returned this money to Soler in view of the fact that the latter's wife has obtained a divorce in a district court of Puerto Rico. Likewise, we shall not, as already indicated in discussing the previous charge, undertake to determine if the defective service rendered the divorce void as a matter of Mexican law. We turn instead to the gravest feature of this charge; namely, that although Bosch knew that the Mexican divorce would not be recognized by courts of the United States, he persuaded Soler to accept a Mexican instead of a New York divorce without advising him that the former would be void.

Bosch admits that the Mexican divorce is void. Indeed, he could scarcely take any other position. Mexico was not the domicil of the defendant wife; and since she was neither properly served nor appeared, the Mexican court had no jurisdiction over her person. *Williams* v. *North Carolina*, 317 U. S. 287, 298. See *Yarborough* v. *Yarborough*, 290 U. S. 202; *Davis* v. *Davis*, 305 U. S. 32. Cf. *Milliken* v. *Meyer*, 311 U. S. 457.

But there was a more serious defect in this judgment of divorce—the Mexican court had no jurisdiction over the subject matter of the proceeding. "Under our system of law,

judicial power to grant a divorce — jurisdiction, strictly speaking—is founded on domicil." *Williams et al.* v. *North Carolina,* 325 U. S. 226, decided May 21, 1945, slip opinion, p. 3. Those who shopped for divorces outside their domiciliary states long clung to the hope that the full faith and credit clause of the constitution would forbid independent inquiry by their home states into the jurisdictional fact of domicil in the divorce forum. Only under that theory could their tourist divorces, obtained after a six week sojourn in Nevada and other states with lenient residence requirements and elastic divorce grounds, be fully effective. These hopes were rudely jolted by the holding in *Williams II.* But Bosch concedes that the Mexican divorces herein, founded as they were on no residence whatsoever in Mexico, did not furnish to its recipients even the slender hope of validity—illusory and ill-founded though it ultimately proved to be—which, prior to *Williams II,* was held out to tourist divorcés. This is because the authorities in the United States have always been unanimous—of the hundreds of cases on this question we know of none to the contrary—that jurisdiction over the subject matter in a divorce proceeding rests upon domicil, or at least residence *animo manendi,* of at least one of the parties in the divorce forum. See cases collected in Annotations, 143 A.L.R. 1294, 105 A.L.R. 817.

We also deem it appropriate to point out that *Williams I*—which was decided a number of months before Soler first got in touch with Bosch in 1943 and which attracted widespread attention, particularly among lawyers who like Bosch engaged in this type of practice—furnished no comfort to Bosch. Although by *Williams I* "the jurisdictional requirement of domicil is freed from confusing refinements about 'matrimonial domicil' ",[16] even there the plaintiff had to make a showing that at least he was domiciled in the divorce forum, however brief the period of residence on which it was

---

[16] *Williams et al.* v. *North Carolina,* supra, slip opinion, p. 3.

based might be. But here we have a streamlined mail order divorce; neither of the parties ever resided in or visited Mexico, or appeared in person at any hearing there.[17]

And finally, how far the courts of New York, Soler's domiciliary State, have gone in refusing to recognize a Mexican divorce is shown by *Querze* v. *Querze*, 290 N. Y. 13, decided in March, 1943.[18] There, despite the fact that both parties, domiciled in New York, purported to submit themselves to the jurisdiction of a Mexican court and consented to the entry of a decree of divorce, the Mexican judgment of divorce was held void. And even the wife, who had obtained the divorce, was not estopped from filing suit for a divorce in New York, despite the intervening marriage of her husband to another woman. The Court of Appeals said at p. 17: "The facts in the instant case are such that the courts of this State can attach no validity to the Mexican decree of divorce (*Vose* v. *Vose*, 289 N.Y. 779). *No one disputes the invalidity of the Mexican decree.* This court has held that a void foreign divorce decree will preclude the spouse who obtains it from asserting in our courts a private claim or demand arising out of the marriage (*Starbuck* v. *Starbuck*, 173 N. Y. 503; *Hynes* v. *Title Guarantee & Trust Co.*, 273 N. Y. 612). But we have consistently held that such a decree will have no effect upon the right of either spouse to a full adjudication in our courts upon the question of the

---

[17] The full faith and credit clause does not extend to judgments of foreign countries. Recognition of such a divorce could therefore result only if a State or Territory of the United States chose to extend it on the vague and flexible principles of comity. This would be apt to happen only if the divorce was in accord with its own notions of policy. And the decisions unanimously refuse recognition through comity to a divorce of a foreign country where neither party ever resided there even though the laws of such foreign country do not make residence or domicil a condition of its court's jurisdiction. See cases in 105 A.L.R. at 822–24; 143 A.L.R. at 1313.

[18] Bosch, a New York lawyer who had the Soler and a number of other Mexican divorce cases pending during 1943, could hardly plead ignorance of this decision.

existing marital status (*Stevens* v. *Stevens,* 273 N. Y. 157; *Davis* v. *Davis,* 279 N. Y. 657; *Vose* v. *Vose, supra; Maloney* v. *Maloney,* 288 N. Y. 532).'' (Italics our.)[19]

In examining the aforesaid authorities we have not been emulating Don Quixote by tilting at windmills. Despite the concession by Bosch that the Mexican divorce he obtained for Soler was void, it is important to see just how worthless it was as compared with what Bosch told Soler he was getting for him.

We are by no means certain that the kind of advice Bosch says he gave Soler and others is worthy of members of our bar. Nor are we as confident as Bosch—he says the proposition is so elementary that no authorities needed be cited therefor—that a marriage by proxy in Mexico immediately after a mail order Mexican divorce would forestall criminal prosecution of Soler in New York or anywhere else for cohabitation with his second "wife". In *Williams II* Nevada divorcés who took even more precautions—they remarried personally in Nevada—came to grief: It will be of little comfort to the defendants while serving their sentences in the penitentiary that their crime is called bigamous cohabitation in North Carolina instead of bigamy. We do not stop to examine the laws of other states, including New York, which doubtless have been resourceful enough to erect criminal sanctions against such flagrant flouting by their domiciliaries of the *mores* of the communities in which they reside—if all else fails, most states, including New York, doubtless still make adultery a criminal offense. But we bypass these matters. What is important for our purposes is to determine what kind of advice Bosch actually gave Soler.

As we have seen, Bosch asserts he advised Soler—and all his other clients who were prospective Mexican divorcés

---

[19] See also §§ 111, 112, Restatement, Conflict of Laws; *Cohen* v. *Randall,* 137 F. (2d) 441 (C.C.A. 2d, 1943); Harper, The Validity of Void Divorces, 79 U. of Pa. L. Rev. 158, 166, 182.

—that his divorce would be void and had no purpose except to protect him from prosecution for bigamy after his remarriage, which must take place by proxy in Mexico. This is an astonishing statement in view of the record before us.

Soler, discovering that Bosch was obtaining a divorce for Fraticelli in New York, got in touch with Bosch, asking him to get a divorce for him in New York. He told him he was domiciled in New York, and that he wanted to marry a girl in New York. He asked by letter of October 7 if he could remarry while he was being divorced. Soler had written nothing to Bosch about a Mexican divorce. Bosch undertook on his own initiative to suggest a Mexican divorce. In his letter of October 13 he advised Soler that he could not remarry for three months after a New York divorce. He then went to say that if he wanted to remarry immediately ''what he ought to do is to be divorced in Mexico, where the divorce will take from six weeks to two months, and above all he would not have to wait any longer, as he could marry as soon as he had the judgment. The cost would be the same, but it is much easier since the only thing he would have to do would be to sign a document that I would send him and the defendant does not have to be summoned. The summons is made there by edicts which are published in the newspaper in the place in Mexico where the divorce is requested.'' Soler accepted this advice and the Mexican divorce was obtained.

We thus see that far from first exhausting all available resources to obtain a New York divorce, which Bosch says was his invariable practice, and far from warning Soler what a worthless decree he would get from Mexico, Bosch talked Soler out of his purpose to get a New York divorce and suggested instead a Mexican divorce. And he painted an attractive picture: in six weeks a divorce could be obtained at the same cost; he could remarry immediately; his wife need

never know—which was what Soler ardently wished—since service would be by publication in Mexico. Not a word about the invalidity of the divorce—indeed, not a word of precaution about marrying by proxy in Chihuahua instead of journeying to New York on furlough to remarry, as Soler planned.

It must be borne in mind that Soler was not a sophisticated socialite who understood the implications of a Mexican divorce and desired it solely because it was regarded as a badge of respectability in certain circles. Here we have an almost illiterate Army private whom Bosch, in a cruel and heartless fashion, led to expect that a Mexican divorce would be valid and would enable him to marry again in New York without any repercussions before he was sent overseas to fight for his country. Only through the fortunate intervention of an Army Legal Officer did this boy avoid disaster. And his marital affairs were finally untangled through a divorce obtained by his wife, who has always resided in Puerto Rico. But Bosch can scarcely claim credit for this happy denouement.

The explanation which Bosch makes of all this correspondence is incredibly lame. Once more he attempts to persuade us that plain language does not mean what it says. He would in effect have us blandly ignore these letters. Instead he asks us to believe that in August, 1943 the girl whom Fraticelli intended to marry if he could obtain a divorce came to see Bosch in New York at the direction of Fraticelli to inquire if Bosch could get a Mexican divorce for Fraticelli; that he advised "them" that Fraticelli should get a divorce in New York because "the Mexican divorce would not serve his purpose, which was to protect rights of inheritance"; that he "left it to her to write Fraticelli"; that she returned shortly thereafter and said that Fraticelli "was in agreement with his advice", whereupon he proceeded to obtain a New York divorce for Fraticelli; that

when he wrote to Soler "telling him that in view of what he had told me as to his urgency, what he ought to do was to obtain a Mexican divorce, I did that knowing that from his conversations with Fraticelli and from having read his correspondence, Soler knew the other details of my advice, given verbally and in letters" that the Mexican divorce would not be recognized in New York.

Bosch took it upon himself to persuade Soler to get a Mexican instead of a New York divorce. He never saw Soler at any time during these events. All his advice to him was given by correspondence. In his letter of October 13 suggesting a Mexican divorce he gave an elaborate explanation of the advantages of a Mexican divorce. But he carefully refrained from mentioning the most important fact about such a divorce: it was worthless in New York. And it is difficult to believe that Soler would have acquiesced in Bosch's plan if he had known the true nature of a Mexican divorce. Bosch does not deny that it was his duty to advise Soler of this fact, particularly as the suggestion for a Mexican divorce emanated from him and not from Soler. But his defense is that he gave him such advice because he was entitled to assume that Fraticelli's sweetheart had written Fraticelli that a Mexican divorce would no be recognized in New York, and that Fraticelli had either told that to Soler or had shown him the letter.

It is incomprehensible to us that a lawyer could believe that he was discharging his full duty to a client like Soler by advice rendered in such an informal manner on such an important question. But even if we were able to condone such conduct, the record here is barren of any proof, except Bosch's assumption to that effect, that Soler ever got such advice via this circuitous route. Bosch has not presented the testimony of Fraticelli,[20] the girl, or any letters from him-

---

[20] Fraticelli is now stationed in Europe, but it is difficult to believe that between November, 1944 and May, 1945 Bosch could not have gotten an affidavit on this question from Fraticelli, who is a life-long friend of his and who has corresponded with him from Europe.

self or from the girl to Fraticelli, in support of this theory.[21] His case rests solely on his own purely speculative argument that this is what must have occurred.

On the other hand, Soler has denied this version of the facts. He testified before the Judiciary Committee of the Senate that he never saw any letter to Fraticelli from Fraticelli's girl or from Bosch to the effect that a Mexican divorce would not be valid. On the contrary, according to his testimony, he was led to believe by the letters of Bosch that a Mexican divorce would be valid for all purposes and would enable him to remarry with impunity in New York; the first intimation he had that a Mexican divorce was void came from the legal officer. Except for Soler's testimony before the Judiciary Committee, the only other competent evidence before us on this issue is the correspondence which we have already summarized. And no one can read the letter of October 13 from Bosch without coming to the conclusion that Soler was reasonably entitled to conclude therefrom that a Mexican divorce would be as good, if not better, than a New York divorce. If more be needed, even Bosch apparently does not contend that he sent word to Soler through the tenuous chain of Fraticelli's sweetheart-to Fraticelli-to Soler, or in any other way, that he could remarry only in Mexico by proxy—which Bosch himself says is the keystone for these Mexican divorce cases. Indeed, Soler might now be serving a penitentiary sentence if it had not been for the timely intervention of the Legal Assistance Officer.

In passing on this charge, we cannot state too emphatically our condemnation of the callous attitude which Bosch displayed toward Soler in connection with the most vital thing in the life of that lad.

---

[21] The letters of October 5, from Bosch to Fraticelli and to Soler, respectively, were written while Bosch still thought Soler would get a New York divorce. And, in any event, on the point now before us, the letter to Fraticelli states merely that since Soler's case is the same as Fraticelli's, if Soler wanted to know any details, Fraticelli should show Soler the original letter from Bosch to Fraticelli. But that original letter or any copy thereof was never presented in evidence here.

We are satisfied that Bosch is guilty of the five charges discussed herein.[22] Proof of such serious charges and the nature of the testimony offered in defense thereof would ordinarily call for severe disciplinary action. But in view of the fact that the record shows that Bosch has always enjoyed an excellent reputation in continental United States and in Puerto Rico and in view of the fact that none of the events herein occurred in Puerto Rico, we shall enter an order suspending Bosch from the practice of law in this jurisdiction for a period of one year.

---

[22] We see no purpose in examining the remaining charges in detail. Charge 6 is that under substantially the same circumstances of fact and law involved in the Soler case, Bosch obtained a Mexican divorce for Pedro N. Ortiz. But the *Fiscal* has not proved his case, as the record contains testimony adequate to show that Bosch communicated to his Mexican correspondent the whereabouts of Mrs. Ortiz; also, the *Fiscal* has presented no testimony to contradict the affidavit of Bosch that he explained fully to Ortiz the limited value of the Mexican divorce.

Charge 7 is a general charge to the effect that Bosch has obtained seven such Mexican divorces knowing that they are invalid in the United States where the plaintiffs and defendants are domiciled, and that he was paid by the plaintiffs therein for his professional services in the belief that they had obtained valid judgments of divorce. But here again there is no proof that Bosch led the plaintiffs to believe they were obtaining divorces which would be recognized in New York.